*590 TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos, la señora Rosaida Torres, (Sra. Torres, o la apelante), y nos solicita que revoquemos la sentencia emitida el 4 de septiembre de 2003, notificada el 27 de octubre del mismo año, por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI). Mediante dicha sentencia, el TPI ordenó a la Sra. Torres devolverle a la señora María de los A. Maldonado, (Sra. Maldonado o la apelada) $2,500.00 de los $5,000.00 pagados por ésta como depósito para que le fuera concedida la opción de compra de una propiedad. De igual forma, la condenó a pagar $1,500.00 por concepto de honorarios de abogado y las costas. 
Examinados cuidadosamente y en su totalidad los escritos de las partes, los documentos que acompañan los mismos, así como el derecho aplicable, resolvemos revocar la sentencia apelada.
La Sra. Torres, corredora de bienes raíces, acordó con los codemandados Sr. Miguel Martínez y la Sra. Hilda Rivera (codemandados) la venta de una propiedad de estos últimos, situada en la Urbanización Sagrado Corazón de Río Piedras. La Sra. Maldonado se interesó en la misma, por lo que la Sra. Torres preparó el Contrato de Opción de Compraventa.
El referido contrato fue firmado por la Sra. Maldonado y su hijo, el Sr. FranHin Rocafort el 21 de noviembre de 2000. Éstos le añadieron al mismo una cláusula en la que condicionaban el perfeccionamiento del contrato a que la Sra. Maldonado lograse vender un apartamento de su propiedad. Los codemandados no aceptaron esta condición, por lo que se redactó un nuevo contrato que excluyó la misma. El referido contrato fue suscrito por la Sra. Maldonado, su hijo, los codemandados y la Sra. Torres el 27 de noviembre de 2000.
*591 El contrato contenía las siguientes cláusulas, entre otras:

“NOVENO: Si la parte COMPRADORA asume la hipoteca o pagase en efectivo, el cierre de la transacción se efectuará en aproximadamente 90 días; si la parte COMPRADORA se propone refinanciar para comprar, el cierre se efectuará en aproximadamente 90 días. Ambas partes reconocen que pueden ocurrir demoras inevitables, pero harán todo lo posible por darle curso a la transacción.

DECIMO: La parte VENDEDORA confiere una opción de compra a la parte COMPRADORA por un término de 90 días, con la entrega por la parte COMPRADORA a Rosaida Torres en este momento de un depósito por la suma de cinco mil dólares ($5,000.00) para conferir la opción de compra antes mencionada...

DUODECIMO: Si la compraventa estuviese sujeta a que la parte COMPRADORA pueda refinanciar la propiedad y ésta no pudiese conseguir refinanciamiento a través de alguna compañía que se dedique al negocio de hipoteca para comprar la propiedad, la parte VENDEDORA acuerda devolverle a la parte COMPRADORA el depósito antes mencionado.

DECIMOCUARTO: Rosaida Torres no se hace responsable por el incumplimiento, tanto de la parte COMPRADORA como de la parte VENDEDORA, en las estipulaciones del presente contrato. Además, las partes convienen en que R. Torres no es responsable por defectos de construcción e imperfecciones en el equipo, por actuar como agente de la parte VENDEDORA.

DECIMOQUINTO: Este contrato está sujeto a la aprobación de la parte VENDEDORA y del agente de Rosaida Torres, en o antes de 3 días laborables. Una vez aprobado por la parte VENDEDORA y por el agente de Rosaida Torres, este contrato será obligatorio para ambas partes y ningún contrato verbal entre las partes modificará el mismo de manera alguna. De no aprobarse, se le devolverá el depósito de opción en su totalidad a la parte COMPRADORA. ”

Por otro lado, la Sra. Torres acordó verbalmente cóiíla Sra.’Maldonado tratar de vender el apartamento de esta última. La Sra. Maldonado insistía que tenía que vender su apartamento para poder comprar la casa que había opcionado. Así, durante los meses posteriores a que la Sra. Maldonado suscribiera el contrato de opción, la Sra. Torres mostró el apartamento a posibles compradores, pero no logró la venta de éste.
El 3 de enero de 2001, la Sra. Maldonado acudió a RG Mortgage Bank en compañía de la Sra. Torres para solicitar financiamiento para la compra de la propiedad objeto del contrato de opción. Según surge de los autos, en la referida institución le informaron que estaba precualificada para la concesión del financiamiento, si vendía su apartamento. Mientras, la Sra. Torres continuó tratando, sin éxito, de vender el mismo.
Así las cosas, con fecha de 8 de febrero de 2001, la Sra. Maldonado le envió una carta a la Sra. Torres, en la cual le expresaba su decisión de rescindir el contrato de opción de compra suscrito el 27 de noviembre de 2000. Solicitó además, la devolución, dentro de un plazo de diez días, de los $5,000.00 que había pagado para que se le concediera la opción de compra. La Sra. Maldonado indicó en su carta que a veinte (20) días de vencerse el referido contrato de opción para adquirir la propiedad de los codemandados, la Sra. Torres no había logrado vender su apartamento, lo que le causaba grandes angustias mentales. Expresó: “Como usted sabe, la compra de dicha propiedad estaba sujeta a que usted vendiera mi apartamento, pues no cuento con los recursos líquidos para realizar dicha transacción si no se ha vendido el mismo.” Señaló que el financiamiento solicitado a RG Mortgage Bank estaba aprobado. Expresó además, “...Es por eso, que para darle la oportunidad de que pueda vender dicha propiedad y porque no es mi culpa que usted no haya podido vender mi apartamento, he decidido rescindir del Contrato de Compraventa que firmamos... ”. En fin, puntualizó que debido a las angustias mentales que le causaban las circunstancias explicadas, se veía en la necesidad de rescindir el contrato de opción. 
*592 La Sra. Torres declaró durante la vista en su fondo que le había explicado a la Sra. Maldonado que si rescindía el contrato no se le devolvería el dinero de la opción. Acotó también, que había llevado la mencionada carta a los codemandados. 
El 28 de febrero de 2001, la Sra. Maldonado entregó una segunda carta a la Sra. Torres, a la cual anejó un documento de denegación de crédito de RG Mortgage Bank con fecha 27 de febrero de 2001. Del mismo surgía que el banco le había denegado el financiamiento, debido a que la apelada tenía obligaciones excesivas. Mediante la referida caita, la Sra. Maldonado solicitó la devolución del depósito de $5,000, en virtud de la cláusula duodécima del contrato de opción.
El 1 de marzo de 2001, la Sra. Torres, con el visto bueno de los codemandados, envió una carta a la Sra. Maldonado, en la que acusaba recibo de su carta del 27 de febrero, y le explicaba que luego de analizar la misma con los codemandados, se percataron que no procedía la devolución del dinero, toda vez que el término para ejercer la opción de compra había vencido el 25 de febrero. Precisó que al la Sra. Maldonado haber notificado la denegación de financiamiento el 28 de febrero, lo había hecho 3 días después de vencido el plazo de 90 días de la opción.
Insatisfecha con dicha determinación, el 30 de noviembre de 2001, la Sra. Maldonado presentó inicialmente una demanda por cobro de dinero en contra de la Sra. Torres. En la misma, alegó que la Sra. Torres tenía conocimiento de que para poder cualificar para el financiamiento tenía que vender su apartamento. Adujo que la Sra. Torres no cumplió con su obligación contractual de devolverle el dinero del depósito, tras haberle notificado antes de los 90 días para ejercer la opción, que no había cualificado para el préstamo con el cual poder adquirir la propiedad. La Sra. Maldonado aclaró que el préstamo había sido preaprobado, y que la aprobación estaba sujeta a la venta de su apartamento. Apuntó además, que desde el 8 de febrero de 2001 había notificado a la Sra. Torres la rescisión del contrato de opción debido al incumplimiento de ésta con el acuerdo de vender su apartamento, por lo que le solicitó también la devolución del dinero de la opción. Finalmente, sostuvo que el 27 de febrero de 2001 le entregó a la Sra. Torres copia del “Statement of Denial, Termination, or Change” mediante el cual el banco le denegó el financiamiento. 
El 4 de febrero de 2002, la Sra. Tomes contestó la demanda. Negó las alegaciones medulares de la demanda y levantó las siguientes defensas afirmativas: Falta de parte indispensable, pues no se había demandado a los dueños de la propiedad objeto del contrato, y quienes retuvieron el dinero en virtud del mismo; que la Sra. Maldonado no había actuado de buena fe después de suscrito el contrato; que ésta no había sido diligente en solicitar financiamiento; que no podía ir en contra de sus propios actos; que la cláusula penal del contrato de opción era válida; que la demanda dejaba de exponer una reclamación que justificara la concesión de un remedio; que de existir alguna deuda, la misma no estaba vencida, que la contratación verbal entre la Sra. Maldonado y la Sra. Torres no era condición para que de efectuara la compra de la propiedad opcionada; falta de jurisdicción sobre la materia, y que no se agotaron remedios administrativos por no acudir al Departamento de Asuntos del Consumidor. 
El mismo día en que contestó la demanda, la Sra. Tomes presentó una Moción Solicitando Sentencia Sumaria y/o Desestimación. Solicitó la Sra. Torres que dictara sentencia sumariamente basándose en la rescisión sin justa causa del contrato por parte de la Sra. Maldonado. 
Posteriormente, el 28 de febrero de 2002, la Sra. Maldonado presentó una Demanda Enmendada a los efectos de incluir en la misma al Sr. Miguel Martínez, a la Sra. Hilda Rivera y la sociedad de bienes gananciales compuesta por ambos, ya que éstos habían sido parte del contrato de opción y posiblemente se habían beneficiado del incumplimiento de la Sra. Torres con su obligación de devolverle el dinero del depósito entregado por la apelada. 
*593 El 8 de marzo de 2002, la Sra. Maldonado presentó su Moción en Oposición a Moción Solicitando Sentencia Sumaria y/o Desestimación. Señaló que si bien era cierto que había intentado rescindir el contrato de opción, desistió de ello a instancias de la Sra. Torres, por lo que el contrato continuó vigente. Sostuvo que era incorrecto que el término del contrato fuera de 90 días, pues el mismo indicaba que era de “aproximadamente” 90 días. Concluyó que como existían controversias sobre hechos materiales en el caso, no procedía que se dictara sentencia sumariamente. Mediante declaración jurada que anejó a la moción mencionada, la Sra. Maldonado sostuvo que con antelación al 25 de febrero de 2001, informó verbalmente a la Sra. Torres que no tenía el dinero para comprar la propiedad de la Urbanización Sagrado Corazón, ya que no podía conseguir el financiamiento debido a que no había podido vender el apartamento. 
El 22 de marzo de 2002, la Sra. Torres replicó la oposición de sentencia sumaria de la apelada. Expuso en síntesis que durante la vista celebrada el 5 de febrero de 2002, las partes habían estipulado que la venta del apartamento de la Sra. Maldonado no formaba parte del contrato de opción. Planteó, además, que la intención de rescindir el contrato de opción de la Sra. Maldonado era final y firme. 
Así las cosas, en abril de 2002, la Sra. Torres contestó la Demanda Enmendada. Adujo que contrario a lo alegado por la Sra. Maldonado, no había incumplido ningún término del contrato de opción, por no ser parte principal en el mismo, sino una simple interventora. Una vez más negó las alegaciones de hechos medulares y presentó las siguientes nuevas defensas: que el caso contenía una controversia sobre interpretación de contratos y no de Regla 60, por lo que el procedimiento sumario era improcedente; que el contrato era claro y no ambiguo; que la Sra. Maldonado era una persona con nivel académico superior y conocía bien sus obligaciones; que la Sra. Maldonado estuvo asesorada en todo momento; que lo acordado mediante el referido contrato era válido en derecho y no dejaba duda sobre la intención del contratante; y que la interpretación del mismo debía hacerse conforme al Artículo 1235 del Código Civil de Puerto Rico. 
La Sra. Hilda Rivera contestó la Demanda Enmendada el 23 de julio de 2002. Mientras el Sr. Miguel Martínez presentó su Contestación-a-la-Demanda el 16-de agosto de igual año. Ambas son-idénlicas._Los codemandados negaron las alegaciones de la Sra. Maldonado y levantaron las siguientes defensas afirmativas: la demandante no actuó de buena fe luego de suscrito el contrato de opción; no fue diligente en solicitar financiamiento en otra institución bancaria; no puede ir contra sus propios actos; en el contrato existía una cláusula penal; la demandante estuvo asesorada en todo momento al firmar el contrato, por lo que no puede alegar que el mismo era ambiguo y de adhesión, la demandante está impedida de ejercer la acción legal por haber terminado el plazo para el recobro por algún motivo establecido en el contrato; la demanda deja de exponer una reclamación que justifique la concesión de un remedio; de existir alguna deuda, la misma no está vencida; la demandante contaba con suficiente capital para adquirir la propiedad; y la demandante no ha emplazado correctamente a los demandados, por lo que el tribunal carecía de jurisdicción sobre la persona de éstos. 
El 22 de octubre de 2002, la Sra. Torres solicitó, mediante moción a esos efectos, que se resolviera la moción de sentencia sumaria que había presentado hacía varios meses. Mediante Resolución del 20 de noviembre de 2002, notificada el 27 de noviembre del mismo año, el TPI determinó que la solicitud de sentencia sumaria debía resolverse después de celebrada la Conferencia con Antelación al Juicio. No obstante, resolvió que los incisos 1,2 y 4 de dicha moción estaban incontrovertidos, por lo que no ameritaban ser probados en su fondo. Estos leían: 1. El 27 de noviembre de 2000, la Demandante, en conjunto con su hijo, firmó un contrato de opción de compraventa con los esposos Hilda Rivera y Miguel A. Martínez. 2. En dicho contrato, la Demandante, interesaba adquirir una casa de dos niveles en la Urb. Sagrado Corazón, calle San Genaro 402 de Río Piedras, por la suma de $170,000.00. 4. Dicho contrato también fue firmado por el hijo de la Demandante. 
En febrero de 2003, las partes presentaron sus respectivos Informes de Conferencia con Antelación al Juicio *594 y se celebró la vista en su fondo el 19 de agosto de 2003. Durante la misma, declararon la Sra. Maldonado, la Sra. Torres, la Sra. Hilda Aponte como representante autorizada de RG Mortgage Corporation, y el Sr. Franklin Rocafort.
El 4 de septiembre de 2003, el TPI dictó la sentencia apelada, la cual fue notificada el 27 de octubre del mismo año. Mediante esta sentencia concluyó que la Sra. Maldonado tenía derecho a requerir de los demandados la devolución de los $5,000.00 dados por ella como depósito para la compra de la propiedad en cuestión, en virtud de la cláusula duodécima del contrato de opción. El TPI determinó que quedó claramente establecido mediante los testimonios que la Sra. Maldonado efectuó las gestiones requeridas para obtener el financiamiento, y que no le fue posible obtenerlo debido a sus obligaciones existentes. Puntualizó el TPI, además, que quedó establecido que la Sra. Torres fue informada dentro del término del contrato que la Sra. Maldonado no había podido conseguir financiamiento para la compra de la propiedad objeto del contrato de opción, dado que no había vendido su apartamento. El TPI fundamentó esta conclusión en que la Sra. Torres continuó mostrando el apartamento a posibles compradores. Concluyó, también, que la Sra. Torres tema el deber de notificarle a los codemandados lo informado por la Sra. Maldonado. El TPI sostuvo que la caita enviada a la Sra. Maldonado el 1 de marzo de 2001, constituia evidencia de que los codemandados tenían conocimiento de que la Sra. Maldonado no había podido conseguir financiamiento y que ésta requirió la devolución del dinero. Por todo lo anterior, determinó que los demandados fueron notificados dentro del término del contrato de opción de compraventa que a la Sra. Maldonado no le fue posible conseguir financiamiento para la compra de la propiedad, y en consecuencia incumplieron su obligación de devolverle el dinero al amparo de la cláusula duodécima del aludido contrato. 
Inconforme, la Sra. Torres acudió ante nos mediante este recurso de apelación y señala la comisión de los siguientes errores:

“Erró el Honorable Tribunal de Primera Instancia al declarar con lugar la demanda, pues conforme a la prueba desfilada la demandante incumplió con los términos del contrato de opción de compraventa-y-eonforme a ello no podía reclamar devolución de suma alguna de dinero.

Erró el Honorable Tribunal al condenar a los demandados al pago de $1,500.00 en honorarios de abogado cuando las partes no fueron frívolas ni temerarias en la tramitación de su caso. ”

En síntesis, argüyó que los términos del contrato de opción eran claros. Adujo que era responsabilidad de la Sra. Maldonado obtener el financiamiento. Precisó que el perfeccionamiento de la compraventa no estaba sujeta a la venta del apartamento de la apelada. Sostuvo que los problemas que haya tenido la Sra. Maldonado para vender su apartamento no podían afectar los términos del contrato.
La Sra. Torres destacó que no era parte en el contrato, pues sólo existían dos disposiciones a su favor, a saber, que de consumarse la compraventa, el vendedor le pagaría por sus servicios el 2% del precio pactado y que, de no consumarse por causa del comprador, devengaría la mitad del depósito dado por éste. Señaló además, que la decisión de devolver o no el dinero residía en los vendedores, y por instrucciones de éstos se confiscó el dinero y se dividió conforme con lo dispuesto en el contrato. La apelante esgrimió que la razón para negarse a devolver el dinero fue justificada. Por otro lado, argumentó que la Sra. Maldonado notificó su intención de rescindir el contrato de opción antes de vencido el plazo de 90 días y sin conocer la denegación de financiamiento del banco. Sostuvo que la denegación final fue obtenida por la apelada transcurrido el término aludido.
En cuanto al segundo error señalado, argüyó que de las determinaciones de hechos del TPI surge que la parte demandada, aquí apelante, no actuó de forma temeraria. La apelante planteó que no se trata de una determinación caprichosa de negarse a cumplir con lo pactado, sino que se entendió que conforme con el *595 contrato, la Sra. Maldonado incumplió con el mismo y como consecuencia decidieron no devolver el dinero. Por todo ello, solicitó que la imposición de honorarios por temeridad fuera dejada sin efecto.
El 29 de enero de 2004, la apelada presentó un Memorando en Oposición a Escrito de Apelación. Sostuvo que el TPI había determinado conforme a la prueba que no empece a que la Sra. Maldonado trató de conseguir financiamiento, éste le fue denegado y la Sra. Torres tenía pleno conocimiento de tal denegación, así como que a pesar de ello, esta última escogió incumplir su obligación bajo el párrafo duodécimo del contrato y no le devolvió el dinero a la Sra. Maldonado.
Respecto a la intención de la Sra. Maldonado de rescindir el contrato, alegó que la rescisión no se materializó a insistencia de la Sra. Torres. Esgrimió además, que la carta de 1 de marzo de 2001 constituye evidencia de ello, pues allí no se menciona tal rescisión, más bien se habló en términos de que la vigencia del contrato había expirado.
En cuanto al segundo error planteado, sostuvo que el pleito que nos ocupa se pudo evitar y que fue indebidamente prolongado por la apelante, por lo que actuó correctamente el TPI al imponerle honorarios por temeridad a la parte apelante. Recordó que ello es una determinación discrecional que le corresponde al tribunal sentenciador.
Así las cosas, el 31 de enero de 2005, la apelante presentó su proyecto de la exposición narrativa de la prueba oral. La parte apelada hizo lo propio el 23 de marzo de igual año. El 22 de abril de 2005, la apelante presentó una moción mediante la cual expresó estar conforme con los cambios efectuados por la apelada a la Exposición Narrativa. En vista de ello, el 3 de mayo de 2005 aprobamos la Exposición Narrativa de la Prueba Oral con los cambios realizados por la apelada y le concedimos a ambas partes el plazo de 20 días para presentar sus respectivos alegatos suplementarios. Luego de prórroga solicitada al efecto, la parte apelada presentó su alegato suplementario el 15 de junio de 2005. Al día de hoy, la apelante no ha presentado el suyo. No obstante, damos por perfeccionado el recurso, por lo que lo procedemos a resolver. -
II
Nuestro Tribunal Supremo ha reiterado que hay recursos en los cuales al analizar los señalamientos de error es imperioso revisar las determinaciones del tribunal de instancia, teniendo presente la norma de que no deberá intervenirse con la apreciación de la prueba hecha por instancia en ausencia de pasión, prejuicio, parciahdad, error manifiesto o que la apreciación de la prueba se distancie de la relación fáctica o ésta sea improbable o increíble. Méndez v. Morales, 142 D.P.R. 26, 40 (1996); Benitez Guzmán v. García Merced, 126 D.P.R. 302 (1990); Pueblo v. Rivero et al., 121 D.P.R. 454 (1988); Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8, 14 (1987); Valencia, Ex parte, 116 D.P.R. 909, 912 (1986); Rodríguez Cancel v. EAE, 116 D.P.R. 443, 451 (1985).
Sin embargo, también ha examinado el más Alto Foro que “aunque el arbitrio del juzgador de los hechos es respetable y merece deferencia, no es absoluto y ‘una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora... ” de un foro apelativo. Mendez v. Morales, supra, pág. 36; Rivera Pérez v. Cruz Corchado, supra, pág. 15; Vda. de Morales v. de Jesús Toro, 107 D.P.R. 826, 829 (1978).
La anterior norma revisora autoriza al tribunal apelativo a que, aunque haya evidencia tendente a sostener las conclusiones de hechos del tribunal de instancia, si de un análisis de la totalidad de la evidencia queda convencido de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, puede entonces considerarlas erróneas. Méndez v. Morales, supra, pág. 36; Abudo Servera v. A.T.P.R., 105 D.P.R. 728, 731 (1977).
Por otro lado, es principio reiterado de derecho que los contratos son negocios jurídicos que existen desde *596 que concurren los requisitos de consentimiento, objeto y causa; y desde ese momento, producen obligaciones que tienen fuerza de ley entre las partes contratantes. Arts. 1213 y 1044 de Código Civil, 31 L.P.R.A. sees. 3391 y 2994; Master Concrete Corp. v. Fraya S.E., opinión de 30 de noviembre de 2000, 2000 J.T.S. 192, pág. 456.
Según dispone nuestro ordenamiento jurídico, los contratos son fuente de obligaciones que se perfeccionan desde que las paites contratantes consienten voluntariamente a cumplir con los mismos. Las partes contratantes no solamente se obligan a lo pactado, sino también a toda consecuencia que sea conforme a la buena fe, al uso y a la ley. Art. 1210 de Código Civil, 31 L.P.R.A. see. 3375; Trinidad García v. Chade, opinión de 18 de enero de 2001, 2001 J.T.S. 10, pág. 792; Amador v. Conc. Igl. Univ. de Jesucristo, 150 D.P.R. 571, 582 (2000).
Nuestro más Alto Foro ha resuelto que los contratos tienen fuerza de ley entre las partes, las cuales tienen que cumplir con lo acordado siempre y cuando no se viole la ley, la moral ni el orden público. Art. 1207 de Código Civil, 31 L.P.R.A. see. 3372; Jarra Corporation v. Axxis Corporation, opinión de 30 de noviembre de 2001, 2001 J.T.S. 167, pág. 488. Sin embargo, también se ha dispuesto que algunos contratos requieren un ejercicio de interpretación para poder determinar la naturaleza de la obligación en que incurrieron las partes. Por esa razón, el Código Civil de Puerto Rico establece ciertas disposiciones para la interpretación de los contratos. La primera regla establece que se debe atender el texto claro de sus cláusulas, cuando las mismas reflejan claramente la intención de las partes. A esos efectos, el Artículo 1233 del Código Civil dispone lo siguiente:
“Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerán esas sobre aquéllas.” 31 L.P.R.A. see. 3471; Caguas Plumbing v. Continental Const. Corp., opinión de 30 de noviembre de 2001, 2001 J.T.S. 169, pág. 507.
Cuando los términos de un contrato son claros y no dejan lugar a dudas sobre la intención de los contratantes, no cabe recurrir a reglas de interpretación. Art. 1233 del Código Civil, supra, sec. 3471; Irizarry López v. García Cámara, supra; Trinidad García v. Chade, supra; Marcial Burgos v. Tomé, 144 D.P.R. 522, 536 (1997). Aún así, hay ocasiones en que no es posible determinar la voluntad de los contratantes con la mera lectura literal de las cláusulas contractuales. Irrizary López v. García Camara, supra. Al respecto, el Artículo 1234 del Código Civil, supra, sec. 3472, establece que se podrá juzgar la voluntad de los contratantes por los actos anteriores, coetáneos y posteriores al perfeccionamiento del contrato.
Al respecto, establece el Artículo 1235 del Código Civil, supra, sec. 3473, que "[cjualquiera que sea la generalidad de los términos de un contrato, no deberán entenderse comprendidos en él cosas distintas y casos diferentes de aquéllos sobre que los interesados se propusieron contratar". Además, el Artículo 1236 del Código Civil, supra, sec. 3474, dispone que "[s]i alguna cláusula de los contratos admitiere diversos sentidos, deberá entenderse en el más adecuado para que produzca efecto". Por lo tanto, si bien hay que considerar la intención de las partes para interpretar los contratos, la interpretación tiene que ser cónsona con el principio de la buena fe y no puede llevar a resultados incorrectos, absurdos e injustos. Irrizary López v. García Camara, supra. Tampoco puede llevar a resultados contrarios al texto del contrato. Éste, repetimos, recoge la voluntad de los contratantes
Las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes, por lo que se debe cumplir con lo expresamente pactado. Artículo 1044 del Código Civil, 31 L.P.R.A. see. 2994. Por tanto, los tribunales de justicia no pueden relevar a una parte de cumplir con lo que se obligó a hacer mediante contrato cuando dicho contrato es legal y válido, y no contiene vicio alguno. De Jesús González v. A.C., 148 D.P.R. 255, 271 (1999); Mercado, Quilinchini v. U.C.P.R., 143 D.P.R. 610, 627 (1997); Cervecería Corona v. Commonwealth Ins. Co., 115 D.P.R. 345, 351 (1984); Olazábalv. U.S. Fidelity, etc., 103 D.P.R. 448, 462 (1975).
Finalmente, se reconoce el contrato de opción como aquél donde una parte llamada concedente, le concede *597 a la otra llamada optante, por tiempo fijo y en determinadas condiciones, la facultad exclusivamente a su arbitrio de decidir respecto a la celebración de un contrato principal. J. Puig Brutau, Fundamentos de Derecho Civil, Barcelona, Ed. Bosch, 2da. Ed., 1982, T. II-2, pág. 50. Atocha Thom McAn, Inc. v. Registrador, 123 D.P.R. 571, 583 (1989). Son requisitos esenciales del contrato de opción, la concesión por una parte a la otra de la facultad de decidir sobre la celebración del contrato por el cual se opta, de modo exclusivo, por plazo cierto y sin otra condición que el propio juicio del optante. J. Castán Tobenas, Derecho Civil Español, Común y Foral, Madrid, Ed. Reus, 14ta ed., 1988, T. IV, pag. 50.
La doctrina ha establecido que el contrato de opción se rige por las reglas generales de las obligaciones y contratos. Debido a que nuestro Código Civil no reglamenta el contrato de opción, nuestro Tribunal Supremo ha adoptado las normas aplicables al mismo. Pérez v. Sampedro, 86 D.P.R. 526, 529 (1962); Irizarry López v. García Cámara, opinión de 27 de noviembre de 2001, 2001 J.T.S. 164, pág. 455.
El contrato de opción se caracteriza por ser uno preparatorio, consensual y generalmente unilateral, pues el optante no está obligado a nada. Aunque son dos las personas que contratan, sólo una de ellas resulta obligada. Si el optante decide ejercer la opción, surge la obligación de parte del concedente de vender y de parte del optante de comprar la cosa objeto del contrato. Es decir, la aceptación por el optante de la promesa de vender hecha por el concedente, implica para las partes no una obligación de dar, como en la compraventa, sino de hacer, de efectuar un contrato de compraventa cuando lo exija cualquiera de los contratantes. Atocha Thom McAn, Inc. v. Registrador, supra, pág. 584; Rosa Valentín v. Vázquez Lozada, 103 D.P.R. 796, 810-811 (1975).
El derecho de opción se extingue mediante el ejercicio positivo, quedando entonces perfeccionado el contrato aceptado y se extingue, sin efecto positivo, si se deja transcurrir el plazo acordado para ejercer la opción. Igualmente se extingue, sin este efecto positivo, si se deja transcurrir el plazo concedido para optar sin hacer ninguna manifestación, o haciendo alguna que tenga la eficacia de una renuncia del derecho. Por la naturaleza temporal del contrato, éste no es imaginable sin un plazo para su ejercicio, por reducido o indeterminado que sea. Por tanto, se suele visualizar el plazo para el ejercicio de la opción como uno de caducidad. Por tal razón, el derecho del optante a declarar su voluntad de dar efectividad al contrato por el cual se opta, caduca, si ésta no es notificada al concedente durante la vigencia del plazo de la opción, si éste se hubiese fijado. Mayagüez Hilton Corp. v. Betancourt, opinión de 19 de febrero de 2002, 2002 J.T.S. 29, pág. 753.
III
Al tenor de la normativa expuesta, evaluemos el primer error apuntado.
Es un hecho indisputado que entre las partes en litigio, se perfeccionó un contrato de opción de compra. Según se desprende del mismo, a la Sra. Maldonado se le concedió la facultad exclusiva de decidir si optar por comprar el bien inmueble en cuestión. Además, se estableció un plazo de 90 días para que ésta ejerciera su derecho de opción a cambio de una prima de $5,000.00. Se pactó además que los codemandados confiscarían dicho dinero si la Sra. Maldonado rehusaba concluir la compra de la propiedad según lo establecido en el contrato.
Ahora bien, de la Sra. Maldonado no conseguir financiamiento para poder adquirir la propiedad, los codemandados se comprometían a devolverle el dinero. En este sentido, es sabido que las partes contratantes no solamente se obligan a lo pactado, sino también a toda consecuencia de ello que sea conforme a la buena fe, al uso y a la ley. Art. 1210 de Código Civil, supra. En virtud de ello, es razonable pensar que la Sra. Maldonado se comprometía a gestionar alternativas para conseguir el financiamiento requerido, así como notificar si lo conseguía o no, dentro del término de la opción, y mientras, los codemandados se comprometían a mantener vigente su oferta de venta hasta el día que caducara el plazo de la opción.
El TPI llegó a las siguientes conclusiones en su sentencia:

*598
“En adición, quedó claramente establecido que la demandada Rosaida Torres fue informada dentro del término del contrato y tenía pleno conocimiento del hecho que la Sra. Maldonado no pudo conseguir financiamiento para la compra de la propiedad en la calle San Genaro, dado que no había vendido su propiedad en el Condominio Sierra del Sol. Esto se evidenció además, por las acciones de la Sra. Torres en seguir enseñando la propiedad de la Sra. Torres [sic] en el Condominio Sierra del Sol.

Cabe señalar que la Sra. Torres tenía el deber de informarle a los demandados Miguel A. Martínez e Hilda Rivera lo informado por la Sra. María de los A. Maldonado. La carta de 1ro de marzo de 2001 sirve como evidencia que los demandados Miguel A. Martínez e Hilda Rivera tenían conocimiento de que la Sra. Maldonado no había podido conseguir financiamiento y que ésta requirió la devolución de su dinero. No empece, decidieron no devolverle a esta última su dinero.

Por todo lo anterior, determinamos que todos los demandados fueron notificados durante el término del Contrato de Opción de Compraventa que la parte demandada, [sic] Sra. María de los A. Maldonado, no le fue posible obtener financiamiento para la compra de la propiedad en la calle San Genaro. ”

De un cuidadoso estudio de la sentencia apelada, de la exposición narrativa de la prueba oral, así como la prueba documental presentada, resolvemos que el TPI llegó a conclusiones que no encuentran apoyo en la prueba admitida.
En primer lugar es preciso aclarar que tener que vender el apartamento de su propiedad para poder conseguir financiamiento no equivale a que la Sra. Maldonado no haya podido conseguir financiamiento. Del hecho de que la Sra. Torres tuviera conocimiento de que para que RG Mortgage Bank le concediera financiamiento, la Sra. Maldonado debía vender su apartamento, no se puede concluir que la apelante tuviera conocimiento de que la Sra. Maldonado no había podido conseguir financiamiento. Ello se debe a que al tenor de la prueba desfilada sería razonable pensar que la Sra. Maldonado tendría otras alternativas para conseguir el mismo, y que las gestionaría. Durante la vista se desfiló prueba de que la Sra. Maldonado contaba con aproximadamente $7,000.00 en una cuenta de ahorros y otra con más de $26,000.00. Si la Sra. Maldonado se concentró en la venta de su apartamento, sin intentar otras alternativas, ello no puede significar que por no haberlo vendido, automáticamente la Sra. Torres tenía que saber que no conseguiría financiamiento, y así informarlo a los codemandados. La Sra. Maldonado declaró que no había hecho ninguna gestión en otros bancos, que no solicitó más tiempo para tratar de conseguir financiamiento, ni que trató de saldar algunas deudas para cualificar para el préstamo. 
Por otro lado, de los autos surge que la Sra. Torres realizó y ejecutó todas aquellas acciones conducentes al otorgamiento del contrato. Tan es así, que acompañó a la Sra. Maldonado al banco para obtener financiamiento, sin que ello fuera su responsabilidad. La Sra. Torres intentó vender el apartamento de ésta, como consecuencia de un acuerdo verbal entre éstas, el cual no formaba paite, ni se relacionaba de forma alguna, al contrato de opción de compraventa. Es meritorio recordar que la cláusula decimoquinta del contrato de opción disponía que ningún contrato verbal entre las partes modificaría el mismo en forma alguna. Al respecto, establece el Artículo 1235 del Código Civil, supra, que "[cjualquiera que sea la generalidad de los términos de un contrato, no deberán entenderse comprendidos en él cosas distintas y casos diferentes de aquéllos sobre que los interesados se propusieron contratar". El contrato de opción de compraventa y el contrato entre la Sra. Torres y la Sra. Maldonado para la venta del apartamento de Sierra del Sol son dos asuntos diferentes. El primero no estaba sujeto al segundo. Que para la Sra. Maldonado sí fuera así, no significa que ello podía peijudicar los términos del contrato de opción.
Examinado el contrato suscrito entre las partes, no surge que para que se perfeccionara el mismo, dicho acuerdo incorporase condición alguna en cuanto a la venta del apartamento de la Sra. Maldonado. Tampoco se desprende que la negativa del banco a conceder crédito a la Sra. Maldonado se tratara de un suceso imprevisto o que previsto, fuese inevitable.
*599 Ciertamente, la retención del depósito por parte de los vendedores estaba limitada por la eventualidad de que la Sra. Maldonado no consiguiera financiamiento. Es decir, no se excluyó la posibilidad que ahora levanta la Sra. Maldonado como causa que impidiese la retención del depósito por los codemandados aunque se encontrase en poder de la corredora de bienes raíces.
Las cláusulas del contrato de opción eran claras. Resolver como lo hizo el TPI, a saber, que los codemandados y la Sra. Torres devuelvan el depósito porque esta última tenía conocimiento de que si la Sra. Maldonado no vendía su apartamento no cualificaría para el financiamiento, evade la controversia principal levantada en este caso. El mismo no trata escuetamente de la obligación del corredor de bienes raíces, sino de que ni los codemandados ni la Sra. Torres están obligados a devolver el depósito a la Sra. Maldonado porque, dada la concurrencia de las circunstancias esbozadas, así expresamente se pactó en el contrato de opción.
La venta del apartamento de la Sra. Maldonado como condición para conseguir el financiamiento necesario para la compra de la propiedad opcionada no se pactó como factor excluyente que impidiese a los codemandados retener el depósito para sí. Incorporarlo al negocio ahora, bajo el palio de que la corredora de bienes raíces estaba obligada a retener el depósito, porque la transacción no se realizó por causas que ella conocía, soslaya y evade el acuerdo que gobierna la relación entre las partes.
Un acuerdo consistente en que no ejercer el derecho de opción de compra dentro del término y en la forma que se establece en el contrato, dará derecho a retener la cantidad pagada por los optantes por esta opción, no viola el orden público ni principios morales.
Habiéndose contemplado y acordado expresamente que los codemandados retendrían el depósito, de no ejercer la Sra. Maldonado la opción dentro del término fijado, la corredora de bienes raíces estaba impedida de devolverlo a ésta, independientemente de que la razón para incumplir con los términos de la opción fueran no haber podido cualificar para obtener el préstamo hipotecario solicitado con miras a comprar la mencionada propiedad, pues la Sra. Maldonado lo notificó ya caducado el plazo de la opción.
De la prueba testifical y documental presentada ante el foro de instancia, surge que al no notificar el rechazo del banco a su solicitud de financiamiento dentro del plazo pactado para ejercer la opción, esto es, en o antes del 25 de febrero de 2001, la apelada dejó de ejercer su derecho de opción, por lo que el mismo caducó. Recordemos que el derecho de opción se extingue mediante su ejercicio positivo, quedando entonces perfeccionado el contrato aceptado. Igualmente se extingue, sin este efecto positivo, si se deja transcurrir el plazo concedido para optar sin hacer ninguna manifestación, o haciendo alguna que tenga la eficacia de una renuncia del derecho. El derecho del optante a declarar su voluntad de dar efectividad al contrato por el cual se opta, caduca, si ésta no es notificada al concedente durante la vigencia del plazo de la opción, si éste se hubiese fijado. Mayagüez Hilton Corp. v. Betancourt, supra.
Cabe señalar que desde el 8 de febrero de 2001, ya la apelada había informado su deseo de rescindir el contrato de opción debido a las alegadas angustias mentales que le causaba no haber podido vender su apartamento hasta ese momento. Evidentemente, al así actuar, la Sra. Maldonado, antes de expirar el plazo para ejercer la opción, rehusó concluir la compra del inmueble según pactado en el contrato de opción de compraventa. A instancias de la Sra. Torres, quien correctamente le advirtió que de rescindir el contrato, no tendría derecho a la devolución del dinero entregado como depósito, la Sra. Maldonado desistió de la idea.
Para el 25 de febrero de 2001, la apelada debía haberle notificado al concedente si iba a ejercer su derecho de opción. De igual modo, debía haber notificado que no había conseguido financiamiento dentro del plazo de 90 días para que tuviese derecho a la devolución del dinero. El hacerlo tres días después, o sea, el 28 de febrero de 2001, ocasionó que caducara el término de la opción y, en consecuencia, en virtud de la cláusula undécima del contrato, los codemandados obtuvieron el derecho a retener el dinero que la apelada había entregado en calidad de *600 depósito. La Sra. Maldonado pretendió justificar su dilación en actuar en que la cláusula novena del contrato en cuestión disponía que el cierre se efectuaría en aproximadamente 90 días. La Sra. Maldonado quiso que dicho término se considerara el plazo de la opción. No le asiste la razón. La cláusula novena claramente se refiere al cierre de la compraventa, evento que depende del banco que financiaría la misma. La cláusula décima, por su parte, claramente y sin lugar a dudas establece un plazo determinado de 90 días para la opción.
Contrario a lo concluido por el TPI, la carta del 1 de marzo de 2001 demuestra que los codemandados advinieron en conocimiento de que la Sra. Maldonado no había podido conseguir financiamiento el 28 de febrero de 2001, mediante carta de la Sra. Maldonado con fecha de 27 de febrero de igual año, es decir luego de caducado el plazo de la opción.
Haciendo paráfrasis de pronunciamientos del Tribunal Supremo en un varios casos, donde ha intervenido con la apreciación de la prueba que han hecho los tribunales de instancia, en este caso, un examen sereno y minucioso de sus autos y de los fundamentos de la sentencia apelada, nos lleva al convencimiento de que las determinaciones del TPI, no sólo no representan “el balance más racional, justiciero y jurídico de la totalidad de la evidencia,” sino que no encuentran adecuado apoyo en la prueba allí presentada. Véase Rivera Pérez v. Cruz Corchado, supra; Ramos Acosta v. Caparra Dairy Inc., 113 D.P.R., 357, 364 (1982). Se cometió el primer error apuntado.
Como consecuencia de lo anterior, es forzoso concluir que no procede la imposición de honorarios por temeridad. No existe temeridad cuando existe una discrepancia honesta en torno al derecho aplicable o cuando se trata de una cuestión novel, no resuelta en nuestra jurisprudencia. Soc. de Gananciales v. Royal Bank ofP.R., 145 D.P.R. 178 (1998); Rivera v. A & C Development Corp., 144 D.P.R. 450, 460 (1997). El Tribunal de Primera Instancia goza de amplia discreción en este tipo de determinaciones. Quiñones López v. Manzano Posas, 141 D.P. R. 139 (1996). Por último, debemos resaltar que el Tribunal apelativo sólo intervendrá en este tipo de caso cuando el Tribunal de Primera Instancia hubiera abusado de su facultad. Ramos Báez v. Bossolo López, 143 D.P.R. 567 (1997); Cotto Morales v. Ríos, 140 D.P.R. 604 (1996).
Del récord ante nos surge que la parte apelante en ningún momento actuó de forma contumaz, temeraria o desprovista de cualquier causa razonablemente justificada. Existía una discrepancia honesta en tomo al derecho aplicable, por lo que Sra. Torres se defendió justificadamente de la acción instada en su contra.
IV
Por los fundamentos anteriormente expuestos,, se revoca la sentencia emitida el 4 de septiembre de 2003 y notificada el 27 de octubre del mismo año y se desestima la demanda.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones